**In re COMMERCIAL FINANCIAL SERVICES, INC., and CF/SPC NGU, Inc., Debtors.**

**Bradley D. Sharp, Trustee of the CFS Liquidating Trust, On Behalf Of Commercial Financial Services, Inc., and CF/SPC NGU, Inc., Plaintiffs,**

v.

**Chase Manhattan Bank USA, N.A.; and Chase Securities, Inc., n/k/a J.P. Morgan Securities Inc., Defendants.**

Bankruptcy Nos. 98–05162–R, 98–05166–R.
Adversary No. 03–0008–R.

United States Bankruptcy Court, N.D. Oklahoma.

Oct. 31, 2005.

562

Robert M. Fishman, Jay S. Geller, George J. Spathis, Richard A. Saldinger, Shaw Gussis Fishman Glantz Wolfson & Towbin, LLC, Chicago, Illinois, Neal Tomlins, Ronald E. Goins, Tomlins & Goins, P.C., Tulsa, Oklahoma, for plaintiffs.

Thomas C. Rice, Mark Thompson, Linda H. Martin, Simpson, Thacher & Bartlett, LLP, New York, New York, Frederic Dorwart, J. Michael Medina, Frederic Dorwart Lawyers, Tulsa, Oklahoma, for defendants.

*ORDER DENYING DEFENDANT'S MOTION PURSUANT TO FEDERAL RULES OF EVIDENCE 104, 702 AND 703 TO EXCLUDE PROPOSED EXPERT TESTIMONY OF LOUISE EPSTEIN ON REASONABLY EQUIVALENT VALUE*

DANA L. RASURE, Bankruptcy Judge.

Before the Court is Defendant Chase Manhattan Bank USA, N.A.'s Motion Pursuant to Federal Rules of Evidence 104, 702 and 703 to Exclude Proposed Expert Testimony of Louise Epstein on Reasonably Equivalent Value (Doc. 163) (the "Motion") and appendices A–KK thereto (Doc. 165), filed on April 13, 2005, by Defendant Chase Manhattan Bank USA, N.A. ("Chase"), as supplemented by the Errata, Exhibit Z Part 3 Through Part 10 to Appendix (Doc. 166), filed by Chase on April 14, 2005; Plaintiffs' Response to Defendants' Motion in Limine to Exclude Testimony of Plaintiffs' Expert Louise Epstein on Reasonably Equivalent Value and exhibits A–E (Doc. 193) (the "Response"), filed on May 3, 2005, by Plaintiffs Bradley D. Sharp, Trustee of the CFS Liquidating Trust, on behalf of Commercial Financial Services, Inc. ("CFS"), and CF/SPC NGU, Inc. ("NGU") (collectively the "Plaintiffs"); and Defendant's Reply Brief in Support of Their [sic] Motion in Limine to Exclude Testimony of Plaintiffs' Expert Louise Epstein (Doc. 211) (the "Reply") and appendices A–DD thereto (Docs. 212, 213, 214 and 215).

A hearing on the Motion was held on June 3, 2005. Upon consideration of the pleadings, the evidence adduced at the hearing, the arguments of counsel and applicable law, the Court finds and concludes as follows:

Plaintiffs have retained Louise Epstein to provide expert testimony in this fraudulent transfer proceeding relevant to the issue of whether Plaintiffs received reasonably equivalent value for certain transfers they made to Chase, specifically, payments made by Plaintiffs to Chase from January 1998 through December 1998 for the purchase of portfolios of "fresh" charged-off credit card accounts (the "Accounts") at a price of 11.75 cents for each dollar owed to Chase by the Account debtors. Based upon her experience in the debt collection industry, Ms. Epstein is prepared to testify that "the value of the Accounts was substantially less than the price that CFS paid to Chase ... [and that] the Accounts that Chase sold to CFS at a price of 11.75 cents on the dollar had a value no greater than 6.1 cents on the dollar." Epstein Report, Plaintiffs' Exhibit ("PX") 54, at 1. Chase moves for the exclusion of Ms. Epstein's proposed expert testimony under Federal Rules of Evidence 702 and 703, as interpreted by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (*"Daubert/Kumho"*).

Chase contends that Ms. Epstein (1) "is not qualified to render opinions in this proceeding, and, even if she possesses sufficient experience, she has not used that experience in preparing her opinions"; (2) has been excluded as an expert witness in other litigation; (3) used novel, unorthodox and unreliable methodology in arriving at her opinion; (4) failed to use a "comparable sales" approach to assess the fair market value of the Accounts and therefore offers an opinion based upon a "legally incorrect standard"; (5) misinterpreted the data on which she relies in forming her opinion; and (6) ignored relevant evidence *of value in rendering her opinion.* Motion at 6, 10, 13, 22, 27–37, 38–40.

Rule 702 of the Federal Rules of Evidence provides—

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. Rule 703 states—

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

Fed.R.Evid. 703.

 The *Daubert/Kumho* decisions established that a trial judge must perform the "gatekeeper" function of "assess[ing] the reasoning and methodology underlying the expert's opinion, and determin[ing] whether it is ... valid and applicable to a particular set of facts" before admitting expert testimony into evidence. *Goebel v. Denver and Rio Grande Western R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir.2000). Excluding expert testimony of doubtful validity is particularly critical in jury trials, since juries may afford undue weight to the pronouncements of a witness advertised as an "expert." The Tenth Circuit Court of Appeals has held that "when faced with a party's objection, [the trial court] must adequately demonstrate by specific findings on the record that it has performed its duty as gatekeeper." *Id.* at 1088.[1] Because Chase has lodged an ob-

---

1. The *Goebel* case concerned the failure of the trial court to act as gatekeeper in assessing the competency of an expert witness before the expert was permitted to testify before a jury. The Court has found no Tenth Circuit authority addressing whether the trial court may abandon its role as gatekeeper when a case will be tried to the bench. All published Tenth Circuit cases addressing *Daubert/Kumho* issues arise in the context of jury trials or potential jury trials. Other jurisdictions appear to soften the scrutiny of expert testimony where the possibility of unduly influencing a jury is absent. *See, e.g., Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir.2004) ("The 'gatekeeper' doctrine was designed to protect juries and is largely irrelevant in the context of a bench trial."); *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir.2000) ("Most of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury."); *Berry v. Sch. Dist. of Benton Harbor*, 195 F.Supp.2d 971, 977 n. 3 (W.D.Mich.2002) ("[T]he court's 'gatekeeper' function under *Kumho* and *Daubert* is less critical when the court itself serves as the trier of fact."); *United States v. 100.01 Acres*, 2002 WL 923925 (W.D.Va.) at 2 ("The gatekeeping function of the court is relaxed where a bench trial is to be conducted ... because the court is better equipped than a jury to weigh the probative value of expert evidence.").

In any event, the Court, as fact-finder, will be bound by the Federal Rules of Evidence and may consider only relevant evidence and testimony of witnesses competent to testify. Whether acting as a *Daubert/Kumho* "gatekeeper" or simply applying the rules of evidence, the Court may appropriately determine the relevance of evidence and the competency of witnesses in advance of trial in order to streamline the trial (or in the case of exclusion of critical evidence, to avoid a trial altogether), and to aid the parties in assessing the

jection to Ms. Epstein's testimony in advance of trial, and an extensive record has been developed, the Court is fully equipped at this point to address Chase's objections to Ms. Epstein's competency to testify with specific findings.

In *Daubert,* the Supreme Court provided guidance in performing the gatekeeping function in the form of a list of non-exclusive factors designed to assess the admissibility of scientific expert opinion evidence. These factors are principally relevant to testimony of a scientific nature, however, and are not particularly helpful in assessing the admissibility of specialized experiential testimony. The *Daubert* factors include: whether the theory or technique has been or is capable of being empirically tested; whether the theory or technique has been subjected to peer review and publication; consideration of the known or potential rate of error; and whether the theory has been generally accepted in the relevant scientific community. *Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786. The court emphasized that the inquiry is a flexible one aimed at assuring "evidentiary relevance and reliability" and that the focus "must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 594–95, 113 S.Ct. 2786. In *Kumho,* the Supreme Court explicitly held that courts possess a duty as gatekeeper to exclude any expert evidence (*i.e.,* testimony in the form of an opinion by one with specialized knowledge) that fails the tests of relevance and reliability, and that the factors used in evaluating relevance and reliability depend on the nature of the issue, the type of expertise and the scope of the testimony. *Kumho,* 526 U.S. at 141–42, 119 S.Ct. 1167.

In evaluating the admissibility of expert testimony, the Tenth Circuit

Court of Appeals has provided the following guidance:

> Generally, the district court should focus on an expert's methodology rather than the conclusions it generates. *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786, 125 L.Ed.2d 469. However, an expert's conclusions are not immune from scrutiny: "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert."). Under *Daubert,* "any step that renders the analysis unreliable ... renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *Mitchell [v. Gencorp, Inc.],* 165 F.3d [778,] 782 [10th Cir.1999] (*quoting In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 745 (3d Cir.1994)). It is critical that the district court determine "whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Id.* at 783 (*quoting Rosen v. Ciba–Geigy Corp.,* 78 F.3d 316, 318 (7th Cir.1996)). Regardless of the specific factors at issue, the purpose of the *Daubert* inquiry is always "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire,* 526 U.S. at 152, 119 S.Ct. 1167, 143 L.Ed.2d 238.

strengths or weaknesses of their positions for settlement purposes.

*Dodge v. Cotter Corp.,* 328 F.3d 1212, 1222–23 (10th Cir.2003).

■■■■ *Dodge,* like *Daubert* and other cases cited in the above-quoted excerpt, concerned scientific evidence, which relies upon the scientific methods and should be objectively testable. In this case, Ms. Epstein is called upon to render an opinion based upon her experience in the debt-buying, selling and collection industry. With respect to such non-scientific testimony, "the *Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than on the methodology or theory behind it." *Hangarter v. Provident Life and Accident Ins. Co.,* 373 F.3d 998, 1017 (9th Cir.2004) (quotation and citation omitted); *see also Kumho,* 526 U.S. at 150, 119 S.Ct. 1167 ("Engineering testimony rests upon scientific foundations, the reliability of which will be at issue in some cases ... In other cases, the relevant reliability concerns may focus upon personal knowledge or experience."). In cases in which the expertise arises from specialized experience, "the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Advisory Committee Notes to Fed.R.Evid. 702.

■■■■ Assuming that the expert's opinion addresses a factual issue of consequence to the legal regime underlying a claim or defense,[2] so long as the expert possesses at least one of the qualifying attributes listed in Rule 702 (specialized knowledge, skill, education, experience or training), "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," *Kumho,* 526 U.S. at 152, 119 S.Ct. 1167, and can identify the source of the facts and data underlying the opinion (demonstrating a connection of the opinion to the facts of the case), the expert's opinion will be admissible, and a probing cross-examination and presentation of opposing experts and evidence will permit the fact-finder to judge the soundness of the expert's conclusions, as well as the expert's credibility and potential bias, in order to assess how much weight to accord the expert's opinion. Even unpersuasive expert testimony is admissible if it is relevant (*i.e.,* it will assist the fact-finder in resolving a disputed factual issue). *See Daley v. Chang (In re Joy Recovery Technology Corp.),* 286 B.R. 54, 70 (Bankr. N.D.Ill.2002) (as is often the case, dueling experts will assist the trier of fact in fully understanding an issue; thus, it is not the

**2.** Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403.

An expert's opinion is not relevant if it does not fit the facts or legal theory of the case. In *General Electric Co. v. Joiner,* for instance, the Supreme Court affirmed the trial court's exclusion of an expert's opinion that furans and dioxins caused lung cancer as *irrelevant* because there was no evidence that the plaintiff was exposed to furans and dioxins; thus, the opinion did not address a fact that was "of consequence to the determination of the action." *Id.,* 522 U.S. 136, 151–52, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (J. Stevens concurrence). However, "if the evidence raised a genuine issue of fact on the question of [the plaintiff's] exposure to furans and dioxins, ... then this basis for the ruling on admissibility [relevance] was erroneous." *Id.* at 152, 118 S.Ct. 512.

function of a *Daubert* hearing to exclude an expert merely because her conclusion may be ultimately rejected).

A pre-trial inquiry into the admissibility of an expert opinion should not focus on the *choice* of facts or assumptions utilized by the expert in reaching a conclusion, although assumptions must have *some* reasonable evidentiary foundation. *See, e.g., Boucher v. U.S. Suzuki Motor Corp.,* 73 F.3d 18, 21 (2d Cir.1996) ("Although expert testimony should be excluded if it is speculative or conjectural, ... or if it is based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith' or to be in essence an 'apples and oranges comparison,' ... other contentions that the assumptions are unfounded 'go to the weight, not the admissibility of the testimony.'" (citations omitted)). Further "[a]lthough an expert opinion must be based on 'facts which enable [the expert] to express a reasonably accurate conclusion as opposed to conjecture or speculation, ... absolute certainty is not required.'" *Gomez v. Martin Marietta Corp.,* 50 F.3d 1511, 1519 (10th Cir.1995), *quoting Jones v. Otis Elevator Co.,* 861 F.2d 655, 662 (11th Cir.1988). "[W]eaknesses in the data upon which [an expert] relied go to the weight the jury should have given her opinions." *Gomez,* 50 F.3d at 1519, *citing Werth v. Makita Elec. Works, Ltd.,* 950 F.2d 643, 654 (10th Cir.1991)(other citations omitted). The fundamental purpose of conducting a trial is to allow opposing parties an opportunity to convince the fact-finder to accept their version of disputed facts; thus, one party's expert will likely assume a set of facts that the other party vehemently disputes. An expert's assumption of certain facts to the exclusion of others does not necessarily render the expert's opinion unreliable.

After meticulously reviewing the Motion, Response, Reply and all appendices and exhibits attached thereto, and considering the testimony presented at the hearing, as well as all exhibits brought to the Court's attention at the hearing, the Court concludes that Ms. Epstein is well qualified by experience, skill and education to offer an expert opinion as to the value of the Accounts according to what a hypothetical, reasonable debt buyer seeking a reasonable return on investment would pay for the Accounts, that Ms. Epstein's method of assessing the value of a portfolio of Chase's Accounts by considering what Chase believed it could collect on its own accounts (as well as other criteria) is one reliable method of placing a value on such Accounts, and that Ms. Epstein's opinion is based upon sufficient facts and data in the record. In addition, the Court concludes that Ms. Epstein's testimony based upon her specialized knowledge will assist the Court in understanding the evidence offered by Plaintiffs and Chase in determining whether reasonably equivalent value was exchanged for Plaintiffs' payments to Chase for the Accounts.

A. *Qualification as expert by knowledge, experience, skill, training and education*

Ms. Epstein is the president of Charge–Off Clearinghouse, LLC, a company she founded in September 1997 and through which she has been buying and selling "bad" or non-performing debt—primarily credit card debt that card issuers have written off their books after a period of non-payment. Through Charge–Off Clearinghouse, Ms. Epstein has purchased over $300 million of charged-off accounts from major financial institutions and from other debt sellers, which she has repackaged into portfolios according to certain standards, and which she either refers to debt collectors to collect for Ms. Epstein's

account[3] or sells to a third party who intends to collect the debt for its own account. The type of debt in which Ms. Epstein has traded since 1997 is substantially similar to the Accounts at issue in this litigation.

Prior to the formation of Charge–Off Clearinghouse, Ms. Epstein's career was focused in the financial arena, both public[4] and private,[5] and immediately prior to forming Charge–Off Clearinghouse, she purchased and sold charged-off debt for Collins Financial Services. Ms. Epstein earned a Masters of Business Administration degree in management information systems and database information systems from the University of Texas at Austin in 1985. She is a charter member of the Debt Buyers Association and a member of the American Collectors Association and the South Dakota Independent Bankers Association. Ms. Epstein is frequently invited to speak about debt buying at industry seminars and events and is widely quoted in industry and trade publications such as Collections & Credit Risk and Credit Card Management about the pricing of portfolios of charged-off credit card accounts and about trends in the industry,[6] and thus she is regarded by her peers as knowledgeable in the field.

Since at least January 1997,[7] Ms. Epstein has regularly evaluated the quality of portfolios of charged-off credit card accounts offered for sale by issuers in order to determine what price to offer for the purchase of portfolios. In so doing, she employs quantitative and qualitative assessments of the portfolios. Ms. Epstein has first-hand knowledge of the factors that influence the collectibility of accounts, has established methods of evaluating the quality of portfolios of accounts, and is keenly attuned to the network of debt buyers and sellers who exchange information about debt issuers, collection rates, prices, and other relevant data. She also has first-hand knowledge of the impact that the portfolio purchasing habits of CFS and its affiliates had on the price of charged-off accounts in 1997 and 1998, and personal knowledge of the market for similar portfolios after CFS and NGU filed bankruptcy and ceased purchasing portfolios of such accounts.

Chase argues that Ms. Epstein's experience in the bad debt market "amounted only to a few days" when the events giving rise to this litigation occurred (*i.e.*, from January 1998 through December 1998). Motion at 6. The Court finds that as a result of Ms. Epstein's extensive experience in the industry since January 1997,

3. Because Ms. Epstein is the sole owner of Charge–Off Clearinghouse, the Court will refer to acts that are technically those of the entity as acts of Ms. Epstein.

4. In the public sector, Ms. Epstein was employed by the City of Austin, Texas, in the treasury department, eventually serving as Assistant Director of Finance. She also served as Director of Funds Management for the General Land Office/Veterans Land Board for the State of Texas; advised the Texas Bond Review Board, as the Assistant Director of the Texas Bond Review Board, in issuing debt; and served on the city council for the City of Austin, Texas. She also worked as a financial advisor to the government of Nepal.

5. Ms. Epstein was employed in the public finance department of the firm of Rauscher, Pierce, Refsnes, as a financial advisor and investment banker. She also served on the board of a mutual fund.

6. See PX 35.

7. Ms. Epstein's first gained experience in purchasing charged-off credit card debt while employed by Collins Financial Services from January 1997 to approximately September 1997. When Collins Financial Services shifted its focus from buying and selling debt to collecting debt, Ms. Epstein left Collins and founded Charge–Off Clearinghouse.

she has a unique perspective of the bad debt market. Ms. Epstein was purchasing charged-off credit card debt at the same time that CFS and NGU were buying the Accounts from Chase, albeit at lower prices. In addition, Ms. Epstein personally observed the price of portfolios adjust downward after CFS and NGU ceased buying debt. While Ms. Epstein did not purchase the volume of debt CFS and its affiliates purchased, Chase did not produce any evidence that the value of any particular account was governed by the size of the portfolio to which it is assigned.[8]

Chase argues that Ms. Epstein failed to use her experience in valuing the Accounts and therefore Plaintiffs cannot rely on her experience to qualify her to render an expert opinion as to the value of the Accounts. Chase contends that while Ms. Epstein normally follows a certain procedure when determining the price she is willing to pay for a portfolio, namely loading account information into a computer program and assessing the likelihood of collecting each account based upon certain quantifiable factors (i.e., geographic loca-

tion of the account debtor and the availability of account debtor information such as current phone numbers, social security numbers, job status, etc.), she did not follow that procedure in rendering her opinion as to the value of the Accounts. Ms. Epstein explained, however, that the information upon which she relied in valuing the Accounts—namely, Chase's view of the collectibility, and thus its perception of the value of the Accounts, based on Chase's knowledge of its own historical collections experience—was more accurate and reliable data than any estimate of collectibility that she could glean from plugging raw data into her software program.[9] The Court agrees that Ms. Epstein does not have to trace the exact steps she would take in assessing the price she would be willing to pay for a portfolio in order to render an opinion as to the value of the Accounts in light of the availability of additional relevant information that would not ordinarily be available to her when evaluating portfolios for purchase. Ms. Epstein considered and evaluated internal Chase documents drafted at or near the time of

---

**8.** Chase's contention that Ms. Epstein should be disqualified from rendering an opinion on value because she runs a one-woman shop is condescending. The fact that Ms. Epstein performs virtually all the functions necessary for locating, evaluating, purchasing and marketing portfolios of the quality required to profit from selling or collecting such portfolios, and that she has done so for almost eight years, bolsters rather than detracts from her qualifications. In addition, as demonstrated by trade publications, Ms. Epstein's peers are not deterred from seeking her opinion on the financial climate of the industry simply because she maintains low overhead costs, assumes multiple roles and performs a wide variety of the critical operations of Charge-Off Clearinghouse herself.

**9.** Ms. Epstein explained that she does not typically rely on the issuer's historical collection data only because such information is usually unavailable to debt purchasers; an issuer generally will not divulge such infor-

mation to an entity seeking to buy the issuer's debt unless the issuer is selling a performing portfolio. In this case, Ms. Epstein was able to obtain information from internal memoranda and testimony of Chase employees and ex-employees regarding their opinions as to the collectibility of Chase's accounts.

Generally Ms. Epstein considers her own experience with respect to a particular issuer and reports by collectors of their collection experience with particular issuers' portfolios in determining whether to purchase a portfolio from an issuer and in setting a price she would be willing to pay for that issuer's accounts. This information falls within the rubric of "reputation" of the issuer which Ms. Epstein disclosed as a factor in determining value. Thus, information concerning Chase's view of its own historical collection experience is not outside the realm of factors Ms. Epstein ordinarily assesses in computing value of accounts, as Chase contends.

the transactions at issue that projected net recoveries on charged-off accounts and the deposition testimony of Chase employees and ex-employees regarding the Chase's customary practice of "working" the accounts intensely prior to offering them for sale, and Chase's historic recovery rates on accounts placed with third party collection agencies, for example.

The Court concludes that Ms. Epstein has sufficient qualifications based on her knowledge, skill, experience, training, and education, to render an expert opinion as to the value of the Accounts.

B. *Disqualification as expert in other litigation*

 Chase asserts that the "exclusion of Ms. Epstein's testimony [in the *Capital Funding, VI, L.P. v. Chase Manhattan Bank USA, N.A.* case] is a relevant fact for the Court to consider in deciding whether to admit her testimony here, particularly because the issues are identical and the decision is so recent." Motion at 11; see also Reply at 6–10. After thoroughly reviewing Ms. Epstein's expert reports in the *Capital Funding* case, as well as the decision excluding her testimony (Exhibit A to the Response and Exhibits D–F to the Reply), the Court concludes that the issues are not identical. In *Capital Funding,* the plaintiff alleged that accounts Chase sold to the plaintiff had been charged off earlier than the accounts identified in the purchase agreement. Because older accounts are more difficult to collect and therefore would be less valuable than the accounts the plaintiff thought it was buying, the plaintiff sought damages for breach of contract. As evidence that Chase sold the plaintiff accounts that did not conform to the charge-off date set forth in the purchase agree-

ment, the plaintiff produced to Ms. Epstein certain TransUnion credit reports for some of the account debtors that suggested an earlier charge-off date. Ms. Epstein was asked to opine about the effect that inaccurate and unreliable information about the account debtors (such as the dates of default and the amount of unpaid balances) would have on the value of accounts sold to plaintiff by Chase. Ms. Epstein's opinion was based on the assumption that the "write-off" date reported by TransUnion was equivalent to Chase's charge-off date. Ms. Epstein testified that discrepancies between the TransUnion "write-off" dates and Chase's representation as to the charge-off dates rendered the accounts uncollectable by the plaintiff because, among other things, discrepancies in delinquency dates and balances could expose the plaintiff to liability under the Fair Debt Collection Practices Act. Thus, Ms. Epstein deemed the accounts worthless to the plaintiff.

The court correctly observed, and Ms. Epstein readily admitted, that she was not an expert in interpreting TransUnion credit reports and therefore she could not render an expert opinion as to whether the charge-off dates of the accounts sold to the plaintiff actually deviated from those promised in the purchase agreement. Because the perceived discrepancy in charge-off dates (and the corresponding lack of confidence in the accuracy of other account information provided by Chase) was the only basis for Ms. Epstein's opinion that the accounts were worthless, the court did not permit Ms. Epstein to testify as to the value of the accounts. Presumably, if Ms. Epstein had performed a valuation using comparable sales or some other valuation approach, the court may have qualified her as an expert.[10]

10. In its memorandum opinion, the court stated: "While perhaps qualified to opine on

Ms. Epstein does not rely on TransUnion reports as support for her opinion as to the value of the Accounts in this case. Rather, she relies on her experience in buying debt of the same type as the Accounts during the relevant period, her experience (and that of her colleagues) in collecting accounts of the same type as the Accounts, and Chase's employees' opinions as to the collectibility of its own accounts at or near the time of the transactions at issue in this case. The exclusion of Ms. Epstein's testimony in the *Capital Funding* case has no bearing on her credentials as an expert on the issue of the value of the Accounts in this case.

## C. Methodology

 In Ms. Epstein's opinion, the value of a portfolio of charged-off credit card accounts is related to the amount a reasonable debt collector will be able to collect; ideally, collections should reimburse the cost of the portfolio and the cost of collection, and provide a reasonable return on the investment. She explains that "the value of a distressed asset or an income-producing asset is related to the cash flows that it is expected to generate, specifically the net present value of the cash flows." Epstein Deposition Transcript (Appendix C to the Motion) at 90. Ms. Epstein states that she does not rely on comparative sales as a benchmark for placing a value on accounts she considers purchasing.[11]

In evaluating the Accounts, Ms. Epstein first considered documentary and testimonial evidence concerning Chase's expectation of future collections based upon its historical collections through third party collection agencies,[12] and deemed that evi-

---

the generalities of the bad debt industry, she is not sufficiently qualified under F.R.E. 702 to read credit reports to determine when Chase charged off accounts, and, therefore, whether Chase breached the Agreement. She does not possess any 'specialized expertise' in interpreting credit reports that would helpful to the jury ..." Exhibit A to Response, at 8. The court further stated: "Ms. Epstein's testimony regarding the value of the portfolio is not admissible. Under F.R.E. 702 her testimony must be 'the product of reliable principles and methods.' Ms. Epstein provided no information as to how she reached her determination. There is no evidence that she conducted any relevant comparisons to ascertain the value of the portfolio." *Id.* at 8–9. While Chase contends that the court held that an expert *must* use the comparable sales method to value portfolios, the issue of what valuation approaches or methods may reliably be used to value charged-off credit card accounts was not before the court in *Capital Funding.* The court merely held that after it rejected the contention that the TransUnion credit reports exposed a discrepancy between accounts promised and accounts delivered, Ms. Epstein disclosed no other evidentiary basis in support of her opinion that the accounts were worthless.

**11.** In confirming her opinion of the value of the Accounts based upon predicted collections, however, Ms. Epstein observed that soon after CFS/NGU ceased purchasing portfolios from Chase, Chase entered into a forward flow agreement with another purchaser for approximately 8.9 cents on the dollar and agreed to renegotiate the contract downward to 7 and 7.5 cents on the dollar a few months later due to the purchaser's dissatisfaction with the quality of the accounts. Tr. at 239–40. Thus, Ms. Epstein did consider comparable sales to some extent in assessing the value of the Accounts.

**12.** Transcript of June 3, 2005, Hearing ("Tr.") at 108–16, 120; Memorandum from Chuck Fridkin to Jim Peyman dated November 18, 1998, PX 14; CFS Update, PX 15; Testimony of Alex Mogielnicki, Plaintiffs' Deposition Designation Binder, Tab 6, at 25, 104–05, 121–22, 181; Testimony of Charles Fridkin, Plaintiffs' Deposition Designation Binder, Tab 1, at 132–33; Testimony of Charles Fridkin, Plaintiffs' Deposition Designation Binder, Tab 3, at 33–64, 75, 77 (historical collection rate of Chase accounts by third party agencies was seven cents on the dollar for primary placements, four cents on secondary placements and three and one-half cents on tertiary placements over two years, all before commis-

dence "highly reliable and indicative of value" of Chase's accounts in general. Epstein Deposition at 33. In addition, she considered the testimony of Chase employees that Chase "beat the hell" out of its accounts prior to selling them, generally retained the accounts of employed debtors in five creditor friendly states (*e.g.*, "cherry-picked" the accounts), and offered deeply discounted settlements to account debtors prior to charge-off, all of which, in Ms. Epstein's experience, reduce the likelihood of collection of accounts that are sold. Transcript of June 3, 2005, Hearing ("Tr.") at 102–04, 331.[13] Again, although Ms. Epstein does not customarily rely on this type of information in pricing portfolios purchased by Charge–Off Clearinghouse, that is only because such information is not ordinarily available. Where an issuer's assessment of value, collectibility and "indifference price" is known,[14] Ms. Epstein concludes that a reasonable buyer would be remiss in ignoring such information.

While Ms. Epstein normally evaluates portfolios prior to their purchase, in this case she was requested to evaluate portfolios after their purchase and disposition, which she likened to an "autopsy." Tr. at 101. Prior to purchasing a portfolio, Ms. Epstein would have an opportunity to "ask[ ] the seller lots of questions." *Id.* Since she could not ask those questions several years after the fact, she studied collection information gleaned from the depositions of Chase employees instead, which she considered more reliable than the information she normally accumulates in order to predict collections. See Tr. at 165 ("[H]ere I didn't have to predict collections; they [Chase employees and Chase documents] gave me some numbers.").

Ms. Epstein also assessed the Accounts using qualitative factors similar to those she ordinarily applied to a prospective portfolio purchase. These factors include the issuer's reputation and perceived quality of its accounts,[15] the manner in which accounts originated, the percentage of accounts the issuer is required to sell and how the issuer selects which accounts to sell and which to retain (*i.e.*, whether the accounts were "cherry-picked" or "creamed"),[16] the nature and extent of ef-

---

sions); Resource Management Services ("RMS") Report, PX 6. Although Charles Fridkin testified that Chase obtained weekly reports of collection results from its third party agencies, reports of Chase's actual historical collection rates were "not available." Testimony of Phyllis Gallay, Plaintiffs' Deposition Designation Binder, Tab 5 at 58.

**13.** See also Testimony of Charles Fridkin, Plaintiffs' Deposition Designation Binder, Tab 1, at 272; Testimony of Phyllis Gallay, Plaintiffs' Deposition Designation Binder, Tab 5, at 26–41; Testimony of Alex Mogielnicki, Plaintiffs' Deposition Designation Binder, Tab 6, at 245–46; RMS Report, PX 6.

**14.** To an issuer of charged-off credit card debt, the "indifference price" is the price at which the issuer could theoretically realize the same revenue by collecting the debt (after deducting collection costs (either internal costs or third party collector fees)) or selling the debt. Epstein Report, PX 54, at 4, 8–9;

Tr. at 53–54. "A sale [of accounts] makes economic sense to an issuer if the sale price is above the issuer's indifference price." *Id.* See also Testimony of Phyllis Gallay, Tr. at 332.

As evidence of Chase's indifference price, Plaintiffs cited the Chase Management Consulting Center Memo dated April 1999, PX 18, at 6–8 (which compared expected collection rates through traditional agencies and internal collection units *unfavorably* to the sale of accounts at 7.5 to 9.5 cents), and the testimony of Chase's valuation expert, Bliss Morris, who stated that she believed that Chase's indifference price in 1997 and 1998 was four to six cents. Testimony of Bliss Morris, Plaintiffs' Deposition Designation Binder, Tab 8, at 195.

**15.** Tr. at 102–03.

**16.** Although the forward flow agreement gave Chase the right to withhold up to twenty percent of all freshly charged off accounts,

forts to collect or settle accounts, both before and after charge-off, the extent of "scrubbing" by the issuer (*i.e.*, deleting ineligible accounts), the treatment of ineligible accounts, and availability of back up documentation on accounts. Epstein Report, PX 54, at 5, 9–12. Ms. Epstein evaluated these factors by reviewing the forward flow agreement between CFS/NGU and Chase, deposition testimony and other documentation, and by using her experience and network of industry contacts.

When deciding whether to buy or sell a portfolio of accounts on behalf of Charge-Off Clearinghouse or for its clients, Ms. Epstein ordinarily downloads information concerning each of the accounts and account debtors into a computer program she developed to evaluate the potential collectibility of accounts based upon quantitative factors such as the size of the outstanding balance, date and amount of last payment, date of charge-off, geographic location of the debtor, availability of debtor's social security number and phone number, and other objective data. Her computer program compartmentalizes these attributes to generate a report which assists Ms. Epstein in predicting the collectibility of the accounts, which in turn drives the price she would be willing to pay for such a mix of accounts, which price would allow for a reasonable rate of return

for her company and the ultimate collector of the accounts. The program does not assign a price or value to the portfolio; it merely provides, in the form of a report, information helpful to Ms. Epstein in determining whether the portfolio contains a disproportionate number of undesirable accounts—account debtors living in debtor-friendly states, having high balances, making low last payments, and/or lacking phone numbers, for example. Ms. Epstein apparently could not access the data on the disk provided to her that purportedly contained this information about the Accounts, and therefore she did not generate a report analyzing the Accounts Chase sold to CFS and NGU.[17] Ms. Epstein satisfactorily explained, however, that she could adequately evaluate the Accounts without this quantitative information because, in addition to the qualitative information mentioned above, she also had what she considered more reliable information, *i.e.*, Chase's assessment of the collectibility of its accounts, which information is normally not available in the marketplace. Epstein Report, PX 54, at 12.

In concluding that the value of the Accounts was substantially lower than the price CFS and NGU paid for them, Ms. Epstein also considered the impact CFS's purchase strategy had on the bad debt

---

and Ms. Epstein believes that there is evidence that Chase "creamed" the portfolios to maintain employment for its in-house collection department and to increase its own recovery, Ms. Epstein testified that she did not take "creaming" into account when assigning a value to the Accounts. Tr. at 60–61, 94–100, 223–24. If she had, she would have assigned the Accounts a lower value because generally "[t]here is a rule of thumb in this industry that you get 80 percent of your collections from 20 percent of your accounts. . . . [I]f I am buying them after they've picked out the stuff most likely to pay, . . . I would value [the accounts] as if they had been to one agency, not fresh, because it's the same effect.

The low-hanging fruit, the easy stuff to collect has been pulled out." Tr. at 94–95.

**17.** Although Chase apparently possesses disks containing information regarding the Accounts and Account debtors for each of the portfolios Chase sold to CFS and NGU, and demonstrated how to access the information contained on those disks at the hearing, there is no evidence that the disks used for the demonstration at the hearing were the same disks provided to Ms. Epstein that were determined to be unusable. In fact, it appears that the data provided to Ms. Epstein *did not* contain information about the Accounts Chase sold to CFS. Tr. at 289.

market and collection industry during the relevant time period and the effect CFS's objective of "capturing the dominant share of the purchased charged-off credit card market" had on portfolio prices. Epstein Report, PX 54, at 7–8. Ms. Epstein opined that the corresponding increase in prices paid for portfolios during that period did not reflect an increase in quality (or value) of the accounts purchased, and would testify from personal knowledge and industry reports that the debt-buying industry perceived that the prices CFS (and its affiliates) paid during 1997 and 1998 were "artificially high." *Id.*

Industry publications support Ms. Epstein's method of measuring the value of charged-off credit card debt. *See, e.g.,* P. Reilly, "Seeking the Perfect Price Point," Collections & Credit Risk (The Monthly Magazine for Collections and Credit Policy Professionals) (June 2000), PX 35 (cataloguing factors debt buyers consider when valuing portfolios); J. Adler, "The Boom in Bad–Debt Bonds," Credit Card Management (February 1998), PX 28 ("Pricing should be a direct result of someone's evaluation of collectible value in a portfolio ..." (quoting CEO of West Capital Financial Services Corp.)); J. Snyder, "Who's Fueling Debt Purchases," Collections & Credit Risk (June 1999), PX 35 ("Creditors [issuers] sell when the price they can get is more than what the debt will return if worked internally or through placements."). Chase also valued accounts "based on the alternatives we had within our means, what recoveries could we produce." Testimony of Alex Mogielnicki, Plaintiffs' Deposition Designation Binder, Tab 6, at 121–22; see also Resource Management Services ("RMS") Report, PX 6, at 8–12 (in evaluating a sample Chase portfolio in order to make recommendations to Chase regarding appropriate price expectations and how to increase the attractiveness of its portfolios to obtain high-

er prices from buyers, consultant RMS used a method of pricing (valuing) accounts that is substantially identical to Ms. Epstein's method, evaluating the same quantitative and qualitative factors Ms. Epstein considers in placing a value on portfolio of accounts). Moreover, Chase's valuation expert, Bliss Morris, opined that debt purchasers "relied on their first hand knowledge of recovery rates, their contracts with sellers and buyers, brokers and several secondary publications" and the "quality of accounts and sellers" as components considered when pricing portfolios. Morris Expert Report, Exhibit A to Reply, at ¶ 5.1.

Ms. Epstein measured the price paid by CFS and NGU against Chase's "indifference price," against the collection rate Chase anticipated to achieve by placing the Accounts with third party agencies, and against Chase's later sales to other buyers after CFS and its affiliates ceased buying debt to conclude that CFS and NGU overpaid for the Accounts. Epstein Report, PX 54, at 8–15. Ms. Epstein chose what she believed was the highest expected twelve month recovery rate of eight cents and reduced that figure by a conservative collection cost rate (24 percent of the amount collected—the lowest contingency fee charged by third party agencies that was cited in Chase documents) to arrive at a maximum value of 6.1 cents. Tr. at 114–16, 211; Epstein Report, PX 54, at 14. Also, in an effort to arrive at a conservative figure, Ms. Epstein did not discount net expected collections to present value. Tr. at 219.

Chase argues that Ms. Epstein employs faulty methodology by considering only the first twelve months of post-chargeoff collections. While there is some evidence that debt buyers ordinarily project some

recovery after twelve months,[18] and Ms. Epstein admitted that a reasonable debt buyer would expect some recovery over a greater period of time, Ms. Epstein concluded that the uncertainty, cost, delay and generally minimal nature of such later collections did not warrant assigning much value to such collections. Epstein Report, PX 54, at 14; Tr. at 236–37. Instead, Ms. Epstein chose not to discount the first twelve months' collections to bring such collections to present value. Tr. at 118–19. Whether a twelve month collection span is sufficient to extrapolate the value of the Accounts is debatable, but it is not so deviant as to render Ms. Epstein's opinion per se unreliable.

The Court concludes that Ms. Epstein applied the same principles and exercised the same rigor in assessing the value of the Accounts for the purpose of her expert testimony in this case that she and other reasonable debt buyers would have applied and exercised in placing a value on the Accounts for the purpose of purchasing the same.

### D. *Comparable sales approach vs. income approach*

■ Chase contends that under relevant law, the *only* appropriate method of determining whether Chase gave reasonably equivalent value to CFS and NGU is by establishing fair market value "by reference to contemporaneous sales of comparable assets." Motion at 29. Chase states that "[f]ederal courts have repeatedly em-phasized the need for comparable sales evidence in resolving questions of disputed value." Motion at 30, n. 18 (citing cases). Thus, absent a comparable sales analysis, Chase argues, Ms. Epstein's opinion as to the value of the Accounts, based as it is on an analysis of probable or estimated collection rates, has no legal relevance.

■ Comparable sales is one way of measuring the fair market value of an asset, but it is not the only way. Moreover, the concept of "reasonably equivalent value" under fraudulent transfer law is not, legally, identical to fair market value. *See BFP v. Resolution Trust Corp.,* 511 U.S. 531, 537, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) ("'The term 'fair market value,' though it is a well-established concept, does not appear in § 548. . . . Section 548 . . . seemingly goes out of its way to avoid that standard term."); *Bundles v. Baker,* 856 F.2d 815, 824 (7th Cir.1988) ("If anything is clear from the various uses of the word 'value' in the Code, it is that Congress did not mean fair market value when it used the term reasonably equivalent value."), *abrogated in part* on other grounds by *BFP,* 511 U.S. at 540, 114 S.Ct. 1757.

■ A consensus of appellate courts instruct that "reasonably equivalent value" should be derived by examining the totality of the circumstances underlying the challenged transfer, of which fair market value may be one component, and even in cases where fair market value serves as a benchmark for reasonably equivalent value,[19] fair market value is often determined

---

**18.** Morris Rebuttal Report, Defendant's Exhibit ("DX") 30, at 6–7 (Ms. Morris cites "gross" collections, whereas Ms. Epstein considers an account's value as collection revenue net of collection costs); Nielson Report dated June 1997, DX 126.1; Portfolio Recovery Associates, Inc. Form 10–K, for FYE December 31, 2004, DX 708, at 4.

**19.** The United States Supreme Court has instructed that "fair market value" is *not* the measure of "reasonably equivalent value" when evaluating whether a transfer of property pursuant to a non-collusive procedurally proper foreclosure sale is avoidable under Section 548, for instance. *See BFP,* 511 U.S. at 545, 114 S.Ct. 1757.

Further, in *Mellon Bank, N.A. v. Official Committee of Unsecured Creditors (In re*

by approaches other than comparable sales. *See Barber v. Golden Seed Co.,* 129 F.3d 382, 387 (7th Cir.1997) ("[T]he formula for determining reasonably equivalent value is not a fixed mathematical formula; rather, the standard for '[r]easonable equivalence should depend on all the facts of the case,' an important element of which is fair market value." (*quoting Bundles,* 856 F.2d at 824)); *Mellon Bank, N.A. v. Official Committee of Unsecured Creditors (In re R.M.L., Inc.),* 92 F.3d 139, 148–54 (3d Cir.1996) (applying "totality of circumstances" test); *Besing v. Hawthorne (In re Besing),* 981 F.2d 1488, 1495 n. 14 (5th Cir.1993) (recognizing consensus on "totality of circumstances" test); *Grissom v. Johnson (In re Grissom),* 955 F.2d 1440, 1445 (11th Cir.1992) (applying "totality of circumstances" test), *abrogated in part* on other grounds by *BFP v. Resolution Trust Corp.,* 511 U.S. 531, 537, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994); *Cooper v. Ashley Communications, Inc. (In re Morris Communications NC, Inc.),* 914 F.2d 458, 470 n. 16 (4th Cir.1990) (recognizing methods other than comparable sales for ascertaining fair market value); *see also Peltz v. Hatten,* 279 B.R. 710, 737–40 (D.Del.2002) (in determining whether debtor gave reasonably equivalent value for a business acquisition, the court applied the "totality of circumstances" test; in assessing value, the court considered both comparable sales and discounted cash flow methods, but gave more weight to comparable sales appraisal and the fact that the parties involved were sophisticated and negotiated at arms length to conclude that the transaction did not diminish the estate to the detriment of the debtor's creditors). Generally, the "totality of circumstances" test is fact-intensive and may include consideration of fair market value (which may be established by comparable sales, income production capacity or some other valid measure of value), the arms-length nature of the transaction, the economic circumstances and relationship of the parties, the maturity, competitiveness and efficiency of the market, industry standards, and other factors.

■ In the fraudulent transfer context, the central issue is whether the recovery the debtor's creditors could legitimately expect to realize from the asset received by the debtor is reasonably equivalent to the value of the asset transferred by the debtor. Such hypothetical recovery to creditors might be realized by a *sale* of the asset received in exchange for the transferred asset (which may implicate the comparable sales approach) or by the income-producing potential of the asset (which may implicate the income approach), or through some less tangible benefit to the debtor which creates value for creditors (*i.e.,* the creation of synergies or other intangible commercial value, if relevant, which implicates the impact on the enterprise value of the debtor as a result of the transfer). *See, e.g., Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide, Ltd.),* 139 F.3d 574, 578–79 (7th Cir. 1998) (guarantee of third party debt may increase enterprise value and thus produce value realizable by creditors); *R.M.L., Inc.,* 92 F.3d at 151–53; *Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 646–47 (3d Cir.1991) ("The pur-

---

*R.M.L., Inc.),* 92 F.3d 139, 148–54 (3d Cir. 1996), the Third Circuit concluded that "fair market value" of services received by the debtor in exchange for fees was not determinative of "reasonably equivalent value" under the circumstances of that case. The Court held that although the loan commitment fees paid by the debtor in exchange for a highly conditional loan commitment were consistent with market rates, the services nevertheless provided no value to the debtor because "all parties should have known there was a substantial probability that the loan would not close." *Id.* at 154.

pose of [Section 548] is estate preservation; thus, the question whether the debtor *received* reasonably equivalent value must be determined from the standpoint of the creditors. . . . The touchstone is whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred."); *Bundles*, 856 F.2d at 824 ("In determining whether property was sold for reasonably equivalent value, the bankruptcy court must, of course, be mindful constantly of the purpose of section 548's avoiding powers—to preserve the assets of the estate" for creditors); *WRT Creditors Liquidation Trust v. WRT Bankruptcy Litigation Master File Defendants (In re WRT Energy Corp.)*, 282 B.R. 343, 407 (Bankr. W.D.La.2001) ("[T]he fair market value of what the debtor gave and received must be valued objectively and from the perspective of the debtor's creditors, without regard to the subjective needs or perspectives of the debtor or transferee."); *Official Committee of Creditors v. Shearson Lehman Bros. Holdings (In re First Capital Holdings Corp.)*, 179 B.R. 902, 907 (Bankr.C.D.Cal.1995) (Reasonably equivalent value is the "objective market value [of the asset acquired by the debtor] at the time of the transfer, looked at from the creditor perspective.").

In *Harman v. First American Bank (In re Jeffrey Bigelow Design Group, Inc.)*, 956 F.2d 479 (4th Cir.1992), the Fourth Circuit indicated that reasonably equivalent value focused on the value available to creditors, stating—

> Reasonably equivalent value is not susceptible to simple formulation. . . . The focus is on the consideration received by the debtor, not on the value given by the transferee. *The purpose of fraudulent transfer law is the preservation of the debtor's estate for the benefit of its unsecured creditors. Consequently, what constitutes reasonably equivalent value must be determined from the standpoint of the debtor's creditors. . . .*

Jack F. Williams, "Revisiting the Proper Limits of Fraudulent Transfer Law," 8 Bankr.Dev. J. 55, 80 (1991) (footnotes omitted) (emphasis added). Hence, the proper focus is on the net effect of the transfers on the debtor's estate, the funds available to the unsecured creditors. As long as the unsecured creditors are no worse off because the debtor, and consequently the estate, has received an amount reasonably equivalent to what it paid, no fraudulent transfer has occurred.

*Id.* at 484. If the challenged transfer resulted in a negative net economic effect on the estate, thus damaging the debtor's unsecured creditors by reducing the size (or potential earning power) of the estate available for the satisfaction of debts, the transfer may be avoidable as a constructively fraudulent transfer. *See WRT*, 282 B.R. at 405.

Ms. Epstein specifically disavowed the comparable sales method for establishing the value of the Accounts in this case because in 1997 and 1998, the market for fresh charged-off credit card accounts was almost universally believed to be artificially inflated due to CFS's stated mission of "corner[ing] the market" for such accounts and its willingness to pay unrealistically high prices for the privilege of freezing out competitors for the Accounts.[20] There is evidence that some debt buyers attempted

---

**20.** See Testimony of Charles Fridkin, Plaintiffs' Deposition Designation Binder, Tab 1, at 94 ("Bill [Bartmann] said . . . that it was his intention to be the sole purchaser of bank credit card paper in the country."); Testimony of Charles Fridkin, Plaintiffs' Deposition Designation Binder, Tab 3, at 85–89,190–91; Testimony of Ruvin Schwartz, Plaintiffs' De-

to match the prices CFS paid in order to remain in business, but for the most part, CFS outbid its competitors, ultimately consuming one-third to one-half of the fresh accounts sold by issuers during 1997 and 1998.[21] Thus, looking to *comparable sales* during the bidding war of 1997–1998 may not be a reliable method of valuing assets purchased by CFS during that time period because one would have to find buyers, *other than CFS and its affiliates,* who were willing and able to purchase large volumes of debt at the prices ultimately paid by CFS and NGU. *See, e.g., Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.),* 263 B.R. 406, 465–66 (S.D.N.Y.

position Designation Binder, Tab 12, at 84–85, 125–27, 132–33 (competitor Coldata lost Chase collections business because CFS was purchasing accounts at prices against which Coldata could not compete; Schwartz believed "the pricing was way out of line."); J. Adler, "The Boom in Bad–Debt Bonds," Credit Card Management (February 1998), PX 28; Memorandum from Chuck Fridkin to Jim Peyman dated November 18, 1998, PX 14, at 6248 ("As we know, when C.F.S. first entered the charge-off purchase market a few years ago, they purposely paid more than their competitors in order to corner the market (*i.e.,* according to other buyers, C.F.S. was overpaying). Just prior to our forward flow contract, C.F.S. was paying about ten cents while others were in the eight to nine cents range."); D. Alaimo, "Fear and Loathing in Tulsa," Collections & Credit Risk (February 1999), PX 23, at 0357, 0362 ("Industry players ... have long been whispering to almost anyone willing to listen that Bartmann was exaggerating recovery rates to build up investor interest in CFS bonds and paying a premium for debt portfolios to drive out competitors.... Another fall out from the CFS situation may be that card issuers now must sell 'at realistic levels for the first time in years,' says ContiAsset [Receivable Management]'s [Mitchell] Bonilla. The 12 cents on the dollar that Bartmann has been paying—and forcing others to pay—is too steep for the quality of the product, other executives say.... William R. Bartmann ... once bragged to Inc. magazine: 'I know I will have made it when I am subpoenaed to testify before Congress on monopolies.' "); Papillon Partners Inc. Report dated April 9, 1999, PX 85, at 1 ("CFS was an aggressive bidder for defaulted consumer debt (and a dominant buyer), and CFS singlehandedly drove the market for such receivables to artificially high levels."); Wedbush Morgan Securities Report re Creditrust Corp. dated November 4, 1999, PX 32, at 12 ("CFS's failure was due to fraud and irrational receivable purchasing deci-

sions. CFS repeatedly bought receivables at prices significantly above market value."); D. Waggoner, "Phoenix, Rising," Collections & Credit Risk (June 2001), PX 29 ("CFS paid major banks sky-high 12 to 14 cents on the dollar prices, well above the market demand.... CFS kept a stranglehold on the market for a few years during this time, courting many of the top 15 banks by paying lavish prices.... Wall Street didn't care that much of the paper with CFS was overvalued."); D. Waggoner, "Debt Sales Ready to Erupt," Collections & Credit Risk (June 2002), PX 35 (As of 2002, " '[t]he irrational buyers [of charged-off debt] are gone and the prices are reflecting the correct economic value, instead of the values assigned by CFS and Creditrust.' " (quoting Craig Grube, of Portfolio Recovery Associates)). *See also* RMS Report (2002), PX 6, at 11 (disregarding as comparable sales the prices paid by any debt buyer during the period that CFS influenced and dominated the market).

Although Chase contends that Ms. Epstein did not disclose that she considered the Papillon Report cited above (Reply at 17), Ms. Epstein in fact quotes from the report in the body of her Expert Report. PX 54, at 6.

21. *See* D. Alaimo, "Fear and Loathing in Tulsa," Collections & Credit Risk (February 1999), PX 23, at 0365 ("Bartmann came close to cornering the market. Industry estimates put his purchasing power on fresh card chargeoffs at 30% to 50%."); L. Punch, "Is There Life After CFS," Credit Card Management (July 1999), PX 25, at 00323 ("Because CFS paid premium rates for fresh debt in an effort to grab market share, other buyers were also forced to raise prices to what one debt buyer termed 'insane' levels or be shut out of business. 'CFS was an aberration in pricing—a powerful aberration because it forced everybody else to offer the same pricing,' said Roger L. Willis, principal at Willis Associates, a San Diego-based collections consultancy.").

2001) (price paid by party who manipulated market was not indicative of value); *see also WRT Creditors Liquidation Trust v. WRT Bankruptcy Litigation Master File Defendants (In re WRT Energy Corp.)*, 282 B.R. 343, 406 (Bankr.W.D.La.2001) ("The willing seller and willing buyer contemplated for fair valuation purposes are hypothetical figures—not the buyer and seller in the transaction at issue [and] . . . 'such a valuation can presume neither incorrigible optimism nor confirmed pessimism on the part of the participants . . . .' " (citations omitted)). There is also evidence that after CFS and its affiliates ceased buying bad debt, the price other buyers paid for the same type of accounts rapidly and dramatically decreased.[22] Thus, there is evidence that CFS may have been paying a premium over the actual value of the Accounts in order to obtain a steady supply of accounts in order to continue financing its operations through securitizations and to discourage competition. Ms. Epstein's opinion that the market was skewed and reasonable debt buyers valued fresh accounts lower than the price CFS paid has some evidentiary support.

Chase's valuation expert, Bliss Morris, is apparently prepared to opine that the val-

**22.** Management Consulting Center Memo dated March 31, 1999, "Chase Cardmember Services—CCS Recoveries: Post Charge–Off Treatment Options," PX 18, at 2, 6–8, 10, 15 (indicates that price obtained for charged-off accounts plunged after collapse of CFS); D. Alaimo, "Fear and Loathing in Tulsa," Collections & Credit Risk (February 1999), PX 23, at 0358, 0363 ("Since CFS's troubles became public in October [1998], . . . [p]rices for fresh credit card chargeoffs have dropped almost 4 cents from a high of 12 cents to 13 cents, although so far this year prices have been slowly rising. . . . In the final two months of 1998, buyers reported sales of 8 cents to 10 cents on the dollar for fresh credit card chargeoffs, down from about 12 cents. 'The prices had to go down,' say the executive from the Midwest buyer. 'You can't make any money at the prices [CFS] was paying.' "); L. Punch, "Is There Life After CFS," Credit Card Management (July 1999), PX 25, at 00323 ("[W]ith CFS out of the picture, prices have fallen to what observers say are more realistic levels. In the months following CFS' bankruptcy, prices on fresh chargeoffs dropped by as much as 25%, from 11 cents or 12 cents on the dollar to about 8 cents or 9 cents, industry sources say. . . . 'Normalcy and logic now prevail,' Willis says. 'The bids coming in now are based on due diligence and collectibility, and not on some outrageous purchase price.' "); L. Punch, "New Life in the Debt Sales Market," Credit Card Management (March 2002), PX 35, at 2–3 ("During 2001, prices for fresh chargeoffs dropped to 4.5 cents to 9 cents on the dollar, depending on the age of the accounts and the size of the portfolio, industry observers say. That com- pared to the 11 cents and 12 cents CFS paid in its heyday. . . . By the end of [2001] one 'very small portfolio' sold for 12 cents on the dollar, with an average price for most portfolios of 6.25 cents to 6.5 cents. . . . The decrease in prices meant that 'prices are more in line with what we saw five or ten years ago,' before CFS and Creditrust dominated the market" (quoting Dennis Hammond, president of The Debt Marketplace, Inc.)). *See also* "Non–CFS Fresh Chart," Exhibit 1 to Morris Expert Report, Exhibit A to Reply (rates paid for fresh Chase accounts were as high as 11.5 cents in January 1999 (the first month after CFS rejected its forward flow contracts), but steadily declined to 8–8.9 cents by December 1999); NLEX "Price by Year" chart, Exhibit 3 to Morris Expert Report, Exhibit A to Reply (indicating decline in fresh price over period of 1997 to 2002 from approximately 11.5 cents to 6 cents, while prices for other products (primary, secondary and tertiary accounts) remained relatively static during that period).

There is also evidence that even though the quality of the portfolios sold by Chase after CFS left the market was enhanced by virtue of Chase offering more favorable terms to buyers (*i.e.,* expanding time to return ineligible accounts), the prices paid by other buyers increased slightly but never matched the 11.75 cents CFS and NGU paid. Tr. at 130–31; PX 2, at 34 (indicating higher price paid for extended time to return bankrupt accounts); Testimony of Diane Piras, Plaintiffs' Deposition Designation Binder, Tab 11, at 146–49.

ue of the Accounts equaled the *price* that CFS paid for the Accounts merely because CFS (and a few other purchasers) paid the price the market demanded at the time. Ms. Morris did not testify at the hearing. However Chase, in effect, appears to hold the view that if CFS or NGU paid 11.75 percent of face value for the Accounts, then a "market price" was established at 11.75 percent and the Accounts must have had a "value" of 11.75 cents on the dollar. From an economic perspective, however, the value of an income producing asset, such as an account receivable, may be more appropriately derived from the income that can be produced by the asset, which may be vastly divergent from the asset's purchase price. Ms. Epstein's approach of evaluating the Accounts from the perspective of what a reasonable debt buyer could expect to collect is not only a reliable and accepted method of determining the value of charged-off credit card accounts, and one actually used by reasonable debt buyers in pricing portfolios, but also may be the preferable method in this case due to irrational economic forces permeating the bad debt market in 1997 and 1998.

Moreover, the price that a debtor is willing to pay "reveals nothing about whether the debtor received something of actual value." *Mellon Bank, N.A. v. Official Committee of Unsecured Creditors (In re R.M.L. Inc.)*, 92 F.3d 139, 149 (3d Cir. 1996). "A court that relies on the fair market value of [assets] (or the arm's length nature of the transaction) as the exclusive test for 'value' would erroneously conclude that value was conferred simply because the debtor parted with 'the going rate,' even though the debtor received nothing in return." *Id.* at 149 n. 3. It is possible to overpay for an asset (*i.e.*, to pay more than the asset's potentially realizable value to creditors) by paying the prevailing market price.[23] It is increasingly likely that the purchase price will exceed the objective value of an asset when the motive for purchasing the asset is to stifle competition by outbidding competitors.

Chase cites *Atlantic Richfield Co. v. Farm Credit Bank*, 226 F.3d 1138 (10th Cir.2000), to underscore its proposition that the price paid in the marketplace is the only reliable indicator of "reasonably equivalent value." Motion at 32. In *Atlantic Richfield*, the appellate court affirmed the trial court's exclusion of an economic expert's opinion of "market value"[24] of $CO_2$ gas where the expert disre-

23. Prices paid for technology stocks during the "bubble" of the late 1990s and prices currently paid for certain real estate are examples of this phenomenon.

24. In *Atlantic Richfield*, the disputed issue was "market value" as that term was used in *a royalty contract*. Thus, the *Atlantic Richfield* court did not purport to define, interpret or assess "reasonably equivalent value" as that term applies in fraudulent transfer proceedings. Nor do the other cases that Chase discusses at length in its Motion purport to determine "reasonably equivalent value." *See Campbell v. United States*, 228 Ct.Cl. 661, 661 F.2d 209 (1981) (tax court was required to determine "fair market value" as the term is used in *Section 1001(b) of the Internal Reve-*

*nue Code* in order to ascertain taxable gain on sale of unregistered securities; court began valuation with the price of publicly traded securities (for stock) or face value (for notes) and discounted the price by 40–43% for impairment in marketability resulting from lack of registration); *Ashland Oil, Inc. v. Phillips Petroleum Co.*, 554 F.2d 381 (10th Cir.1975) (litigation was required to set a price for helium that mineral owners had been forced to deliver to the government under the *federal Helium Act*; the appellate court agreed with the trial court that no comparable sales could be established because the government held a monopoly on the purchase of helium during the relevant time period and set an artificially low price; although expressing a preference for comparable sales method for valuing a

garded evidence of comparable sales due to the expert's belief that the market was not competitive, but rather was dominated by buyers and sellers who had a mutual interest in maintaining a low price. *Id.* at 1165–67. In the absence of a truly competitive market, the expert estimated a hypothetical value based upon the value of the product's use in enhancing oil recoveries. *Id.* The trial court rejected the expert's valuation method in light of the existence of actual comparable sales of the product in other jurisdictions and markets, and the circuit panel, applying a deferential standard, found that "the district court's conclusion that [the expert] strayed too far from available sales data cannot be described as 'manifestly unreasonable.'" *Id.* at 1167.

Although Chase contends that the Tenth Circuit "flatly rejected" the view that comparable sales during a period of market distortion may not reflect value and that it also rejected the view that value may be derived from the benefit conferred by the product (a position adopted by Ms. Epstein), the appellate panel was not so dismissive of the expert's theory, stating "[s]uffice it to say that our standard for review plays a major role in the disposition of this issue. Whether the existence of other markets and the sales data presented by [the opponent of the expert] fatally undermine [the expert's] theory is eminently debatable. If our review were *de novo*, we might very well conclude that [the expert's] theory explains or otherwise accounts for these markets and data." *Id.* at 1168.

Moreover, the Tenth Circuit also acknowledged another theory adopted by Ms. Epstein—that "value" and "market price" "are not always synonymous." *Id.* at 1166 n. 14.[25] The circuit panel observed—

---

commodity in order to determine what the buyer should pay the seller, the court affirmed the use of the "work-back method," an alternative valuation procedure commonly used in valuing natural gas, because no competitive market existed); *Emor, Inc. v. Cyprus Mines Corp.*, 325 F.Supp. 931, 940–41 (W.D.Pa. 1971) (court interpreted the term "market value" where *contract* to sell business required the payment of the higher of "market value" of copper inventory or its original cost; based upon parol evidence (negotiations, preclosing calculations and communications), the court determined that the parties to the contract subjectively intended "market value" to mean the market price published on the New York Merchant and Dealer Market on the closing date of the transaction rather than the more stable "producer price" which did not fluctuate with supply and demand or an estimated market value based upon "net realizable value of the copper content in a fabricator's products."), *aff'd in relevant part*, 467 F.2d 770, 778–81 (3d Cir.1972).

Significantly, these cases recognize that in certain circumstances, the prevailing market price may not be a reliable indicator of value. *See Atlantic Richfield*, 226 F.3d at 1168; *Campbell*, 661 F.2d at 221; *Ashland*, 554 F.2d at 386. Further, the court in *Emor* concluded that while a strike against copper producers might have unreasonably skewed the market, thereby creating a discrepancy between value and market price, the strike was not an unforeseen circumstance that excused the performance of the contract as written, and therefore did not justify using a valuation method other than the market price quoted by the Dealer Market on the closing date, which was the valuation method agreed to by the parties to the contract. *Emor*, 325 F.Supp. at 944–45.

25. In her Report, Ms. Epstein states—

Market price may have little, if any, usefulness, for the determination of value. The price that a particular debt buyer is willing to pay for accounts at a given point in time does not necessarily reflect the portfolio's value. Debt buyers compete against each other for portfolios, and pay prices that enable them to win bids and hopefully, to profit. The fact that a buyer pays more for a portfolio may simply mean that it was more expensive, not that it was more valuable.

Epstein Report, PX 54, at 4.

Market price is the price that is actually paid by buyers for the same commodity in the same market. It is not necessarily the same as "market value" or "fair market value" or "reasonable worth." Price can only be proved by actual transactions. Value or worth, which is often resorted to where there is no market price provable, may be a matter of opinion.

*Id. See also R.M.L., Inc.*, 92 F.3d at 149–50 (The bank's "assertion in this case that it has conferred value simply because the fees it charged [debtor] represent the fair market value of [the bank's] services . . . misses the mark" because the services did not provide anything of potentially realizable value to the debtor's estate.). Thus, although the price CFS and NGU paid for the Accounts may be indicative of their value or worth, it is also possible that the price was simply a consequence of CFS's strategy to dominate the market and bears no relationship to value of the Accounts themselves.

Chase also argues that measuring the value of the Accounts by what Chase or other "reasonable debt collectors" could collect on the Accounts (Ms. Epstein's approach) is not relevant to the value of the Accounts to CFS and NGU because CFS and NGU bought the Accounts for the purpose of reselling them to securitization trusts.[26] Chase contends that because investors in the securitization trusts paid CFS more for the Accounts than CFS paid Chase for the Accounts, CFS received more than reasonably equivalent value for CFS's payments to Chase for the Accounts, a factor Ms. Epstein does not take into account. CFS counters that the funding CFS ultimately received as a result of

the securitization transaction was not simply payment for the Accounts that were transferred to the securitization trust, but constituted an investment in a package that included a commitment by CFS to, among other things, collect the Accounts (for a fee that CFS contends was inadequate to reimburse CFS for its actual cost of collecting the Accounts), and provide other services (establishing reserves, accounting for, reconciling, reporting, and distributing proceeds, etc.). Tr. at 253–59. The Court agrees that the sale of the Accounts to the securitization trusts was a component of a larger transaction that obligated CFS to, among other things, convert the same Accounts into cash sufficient to repay the securitization investors their principal investment plus interest. Consequently, the value of the immediate infusion of cash resulting from the transfer of the Accounts to the securitization trusts was offset by CFS's other obligations under the basic documents and the obligation to expend resources in the future to collect the Accounts. CFS transferred the Accounts to the securitization trusts in exchange for money plus an obligation to provide future services; that transaction does not establish a "comparable sale" against which purchase of the Accounts from Chase may be measured.

In any event, at this stage, the Court need not determine which method (comparable sales approach, income or benefit approach, or some other approach) would most accurately establish the value of the Accounts on the date of their transfer. Moreover, CFS and NGU need not establish the exact value of the Accounts in order to establish the element that they received *less than* reasonably equivalent

26. More accurately, NGU, as a "warehouse buyer," purchased the Accounts solely for the purpose of transferring them as dividends to CFS, and CFS transferred the Accounts to another entity that ultimately transferred the Accounts to the securitization trusts. Tr. at 252–54, 263–64.

value in exchange for their payments to Chase.[27] While Ms. Epstein's opinion of value based on her opinion of the distortion of the market at the time of the transaction and her perceived collectibility of the Accounts may be somewhat unorthodox in traditional business valuation circles, opinion based on personal observations and experiences in actually assessing the value of accounts as a player in the debt collection industry, rather than on academic valuation theory, is reliable, and her opinion is supported by some evidence in the record. Moreover, her testimony regarding the state of the market at the time of the transfers is relevant to application of the "totality of the circumstances" test used to assess reasonably equivalent value in fraudulent transfer cases. The Court concludes that Ms. Epstein's opinion of value of the Accounts is relevant and reliable notwithstanding that she does not base her opinion on comparable sales.

### E. Assumptions and interpretation of data

 Chase contends that Ms. Epstein misinterprets documents she cites as evidence of Chase's predictions of collectibility of their own accounts. Motion at 23–25; Reply at 30–31. However, Ms. Epstein articulated an adequate evidentiary foundation for her assumptions[28] and Chase may present its contrary evidence at trial.

 Chase also argues that Ms. Epstein misread the forward flow agreement between Chase and CFS/NGU in concluding that the agreement restricted CFS from collecting from Account obligors by commencing litigation, which restriction she believed devalued the Accounts. While the agreement might have permitted CFS to sue an Account obligor,[29] Ms. Epstein's opinion was not based solely on that factor, and to the extent that her opinion was influenced by that factor, the Court may adjust the weight it accords Ms. Epstein's testimony if appropriate.[30] "[W]eaknesses in the data upon which [an expert] relied go to the weight the jury should have given her opinions." *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519 (10th Cir.1995), *citing Werth v. Makita Elec. Works, Ltd.*, 950 F.2d 643, 654 (10th Cir.1991) (other citations omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Accordingly, Chase's challenges to Ms. Epstein's understanding of the evidence do not preclude her from testifying.

### F. Reconciling other evidence of value

Chase also argues that Ms. Epstein selectively ignores other relevant evidence of

27. *See, e.g., Breeden v. L.I. Bridge Fund, LLC (In re Bennett Funding Group, Inc.)*, 232 B.R. 565 (Bankr.N.D.N.Y.1999) (court did not determine the exact value of the warrant sold by the debtor, merely that its value substantially exceeded the price paid by the defendant).

28. See Tr. at 116–19 and exhibits cited therein.

29. CFS's counsel, Caroline Benediktson, believed the provision in the agreement was ambiguous. Tr. at 273–78.

30. Ms. Epstein testified that regardless of the terms of the forward flow agreement, she understood that it was CFS's policy to not to sue obligors, and therefore it did not matter whether the agreement precluded litigation. Tr. at 234; see also Testimony of Caroline Benediktson, Tr. at 273–74. In addition, Ms. Epstein stated that her valuation assumed that a reasonable debt buyer would use all available means, including litigation, to collect the Accounts. Tr. at 235.

value.[31] However, Chase employed its own expert, Bliss Morris, who has chosen other documents and data to support her own opinion of value, to the exclusion of some data and documents relied upon by Ms. Epstein. "The detailed fact-finding and valuation entailed in the reasonably equivalent value analysis often 'requires the fact finder to assess the contrary opinions of the competing experts.'" *WRT Creditors Liquidation Trust v. WRT Bankruptcy Litigation Master File Defendants (In re WRT Energy Corp.)*, 282 B.R. 343, 405 (Bankr.W.D.La.2001). The Court

will be in a better position at trial, after the presentation of all evidence, to evaluate the quality of the data relied upon by each expert, enter actual findings of fact, and accordingly determine the weight to which each experts' opinion should be accorded.

## G. *Conclusion*

For the reasons stated herein, the Court concludes that Ms. Epstein is qualified by knowledge, skill, experience, training and education to render an opinion as to value

---

**31.** For instance, Ms. Epstein ignored a contemporaneous sale of a portfolio by Chase to First Select at 12.5 cents on the dollar. Chase deems this a "comparable" sale that supports its view that its sales of accounts to CFS and NGU at 11.75 cents on the dollar constituted reasonably equivalent value. Reply at 43. After reviewing the contract underlying the First Select sale, Ms. Epstein concluded that it was not comparable to the portfolios Chase sold to CFS and NGU because the First Select portfolio was a "single state" portfolio—that is, it contained only accounts of obligors located in New York. Tr. at 120; PX 52.

At the hearing, Chase objected to Ms. Epstein's testimony that the portfolio sold by Chase to First Select was not comparable to the portfolios at issue herein because Ms. Epstein did not disclose this information in her expert report. Tr. at 121–23. The Court overruled the objection on the ground that Ms. Epstein's testimony did not constitute a discrete opinion that was required to be disclosed, and that Chase had attached the First Select contract as an exhibit to its Reply, raising the issue of First Select's comparability itself. Tr. at 137; Exhibit A to Reply.

After further reflection, the Court also concludes that although Ms. Epstein's expert report does not speak specifically to the incomparable features of the First Select portfolio, it does fairly disclose her view that "the value of any portfolio is based on the collections that the portfolio will generate. The best indicator of a portfolio's value is the collections on *similar portfolios* from the same issuer." Epstein Report, PX 54, at 4. Further, she stated that in valuing a portfolio, a reasonable debt buyer will consider the "geo-

graphic stratification of the accounts. Accounts in debtor-friendly states of Florida, North Carolina, South Carolina, and Texas are considered to be less collectable than accounts in Midwestern and Mid–Atlantic states." *Id.* at 6.

Moreover, Ms. Epstein directly addresses the issue of comparability in her Rebuttal to the Report of Bliss Morris, PX 55. In that report, Ms. Epstein states that Ms. Morris "fails to account for the significant differences in value between different portfolios of charged-off credit card accounts." *Id.* at 1. "Further, portfolios of accounts limited to certain states or regions are not comparable to the Accounts that CFS purchased pursuant to the Forward Flow Contract. Nevertheless, in her Report, Ms. Morris relies on more than one occasion on single state sales to attempt to justify the price that CFS paid to Chase for the Accounts.... Selective state purchases such as those just described are more valuable than the national portfolios that CFS purchased from Chase...." *Id.* at 4. Ms. Epstein refers to two examples of single state portfolios in her rebuttal report, but does not specifically address the First Select portfolio. Nonetheless, the Court concludes that Ms. Epstein's disclosed opinion regarding single state portfolios is broad enough to envelop the First Select portfolio and sale. Accordingly, in addition to overruling the objection for the reasons stated on the record, Chase's objection is overruled because Ms. Epstein has fairly disclosed her opinions that (1) dissimilar portfolios have no bearing on the value of portfolios sold to CFS and NGU and (2) the value of single state portfolios are not indicative of the value of national portfolios.

of the Accounts, that she assessed value by considering factors and information commonly considered and reasonably relied upon by buyers of charged-off credit card debt, that she identified some evidentiary support for her opinion, and that her testimony will assist the Court in understanding evidence relevant to evaluating whether CFS and NGU received reasonably equivalent value in exchange for the purchase price they paid to Chase for the Accounts. Defendant Chase Manhattan Bank USA, N.A.'s Motion Pursuant to Federal Rules of Evidence 104, 702 and 703 to Exclude Proposed Expert Testimony of Louise Epstein on Reasonably Equivalent Value is therefore denied.

**SO ORDERED.**